AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT
☐ SUPERSEDING

**OFFENSE CHARGED**

18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. §§ 981(a)(1)(C), 982 & 28 U.S.C. § 2461(c) – Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: See attachment

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**DEFENDANT - U.S**

▶ ERIC MANDELL

DISTRICT COURT NUMBER

**CR 25 0331 AMO**

**DEFENDANT**

---

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)
FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form: Craig H. Missakian
☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Evan Mateer

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes  ☐ No
If "Yes" give date filed

DATE OF ARREST ▶  Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶  Month/Day/Year

**FILED OCT 9 2025**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☒ SUMMONS  ☐ NO PROCESS*  ☐ WARRANT   Bail Amount: ____

If Summons, complete following:
☐ Arraignment  ☒ Initial Appearance

Defendant Address:
559 Grimsby Lane, Danville CA 94506

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: 10/16/2025 10:30am   Before Judge: Donna M. Ryu

Comments:

# PENALTY

Counts 1-6 18 U.S.C. § 1343 (Wire Fraud):

Penalties: Maximum twenty years' imprisonment (18 U.S.C. § 1343); $250,000 fine (18 U.S.C. § 3571); maximum term of supervised release: 3 years (Class C Felony - 18 U.S.C. § 3583_; $100 special assessment (18 U.S.C. § 3013).

Count 7 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

Penalties: Maximum 10 years of imprisonment (18 U.S.C. § 1957(b)(1)); $250,000 fine or twice value of criminally derived property involved in transaction (18 U.S.C. §§ 1957(b)(2), 3571(b)(3)); maximum term of supervised release: 3 years (18 U.S.C. § 3583(b)(2)); $100 special assessment (18 U.S.C. § 3013)

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: OAKLAND

FILED
OCT 9 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

V.

ERIC MANDELL,



CR 25 0331

AMO

DEFENDANT(S).

## INDICTMENT

18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. §§ 981(a)(1)(C), 982 & 28 U.S.C. § 2461(c) – Criminal Forfeiture

_____
A true bill.

_____
Foreman

Filed in open court this  9th  day of

October, 2025

Ivy L. Garcia  10/9/25
_____
Clerk

Bail, $ Summons

Hon. Donna M. Ryu, Chief Magistrate Judge

10/9/25

1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney

FILED

OCT 9 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 25 0331 AMO |
| Plaintiff, | |
| v. | VIOLATIONS: 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. §§ 981(a)(1)(C), 982 & 28 U.S.C. § 2461(c) – Criminal Forfeiture |
| ERIC MANDELL, | |
| Defendant. | OAKLAND VENUE |

INDICTMENT

The Grand Jury charges:

Introductory Allegations

At all times relevant to this Indictment:

1.  TD Global Development, LLC (TD Global) was a California domiciled limited liability corporation.

2.  Hetfield Partners LLC (Hetfield Partners) was a California domiciled limited liability corporation.

3.  The Hills SF, LLC (The Hills SF) was a California domiciled limited liability

INDICTMENT

corporation.

4. Hetfield Estate Partners LLC (Hetfield Estate Partners LLC) was a California domiciled limited liability corporation.

5. Brasillia Hills Partners LLC (Brasillia Hills) was a California domiciled limited liability corporation.

6. Defendant Eric MANDELL resided in the Northern District of California. MANDELL was the organizer and managing member of TD Global beginning on or about January 13, 2014. MANDELL was the organizer and sole managing member of Hetfield Partners beginning on or about December 14, 2015. MANDELL was the organizer and a managing member of The Hills SF beginning on or about August 14, 2017. MANDELL was a manager of Hetfield Estate Partners beginning on or about May 17, 2021. MANDELL was a manager of Brasillia Hills beginning on or about September 17, 2021.

7. Bank of America Corporation was a financial institution as the that term is defined in Title 31, United States Code, Section 5312, the deposits of which were insured by the Federal Deposit Insurance Corporation.

8. Charles Schwab Bank, SSB was a financial institution as the that term is defined in Title 31, United States Code, Section 5312, the deposits of which were insured by the Federal Deposit Insurance Corporation.

9. Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch), was a registered broker-dealer and investment advisor, and a wholly owned subsidiary of Bank of America Corporation.

10. Northern California Mortgage Fund VII, LLC dba NCM Lending was a Reno, Nevada based mortgage lending company that provided commercial mortgage and reverse mortgage loans in California and Nevada, regulated by the Nevada Department of Mortgage Lending and California Department of Real Estate.

11. Alliance Portfolio was a full service, boutique, private money lender that arranged lending for real estate mortgage investments and was regulated by the California Department of Real Estate and the California Department of Business Oversight.

12. Construction Loan Services LLC was a private construction lender providing financing

INDICTMENT

for real estate development projects, including construction loans, acquisition loans, and bridge loans.

## The Scheme to Defraud

13. Beginning at a date unknown to the grand jury, but no later than June 10, 2014 and through a date unknown to the grand jury, but to at least January 2023, MANDELL knowingly devised, intended to devise, and carried out a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions and concealment of material facts with a duty to disclose.

As part of the scheme to defraud:

14. Between on or about June 10, 2014 though at least January 2023, MANDELL induced Victim 1, Victim 2, and Victim 3 to invest in a series of fraudulent real estate development projects, falsely assuring the victims that their investments would be used to develop the properties, when in fact MANDELL made little effort to develop the properties as promised, and instead stole substantial portions of their investments for his own personal use

### *MANDELL fraudulently induced Victim 1 to invest in real estate development projects and stole Victim 1's investment*

15. In or about June 2014, MANDELL met Victim 1 and solicited his investment in a purported real estate development project. MANDELL represented to Victim 1 that he was a real estate developer who purchases small homes on large lots, which he would develop by adding multiple homes that he would sell for a profit. MANDELL learned that Victim 1 owned an apartment building in Sacramento, California and urged Victim 1 to take out a loan on this property in order to invest the money in a real estate development project with MANDELL.

16. On June 10, 2014, MANDELL sent Victim 1 an email that detailed his proposal for MANDELL to invest in two real estate development projects, one in Hayward and one in Belmont, California. MANDELL told Victim 1 that he would need "$14,000-$18,000 to be used for initial deposits on" the two projects. This money was also to be used for "some initial design and engineering asap on the Hayward project." Beyond the initial money, MANDELL said he would need the proceeds on the loan that Victim 1 would take out on his Sacramento property. MANDELL told Victim 1 that he had a lender in place for a $150,000-$200,000 loan. MANDELL told Victim 1: "You would have no

INDICTMENT                                              3

obligation for the payments, the projects would cover all payments." MANDELL also promised Victim 1 that he would receive "12-14% return on the net profit of each home as they sell."

17. On June 15, 2014, MANDELL sent Victim 1 another email regarding the supposed development projects. The email included a scanned copy of a Management and Operating Agreement for TD Global Development, LLC. MANDELL told Victim 1 that "[b]esides the Hayward property and the Belmont new construction we have an offer out on one of [Person 1's] houses on Tice Valley Blvd in WC. Also, my new operations manager starts tomorrow morning and we are going to start on the approvals for Hayward right off." MANDELL emphasized that he "need[s] to get the initial funds as soon as possible" and so asked Victim 1 to review and provide any "last minute revisions . . . tonight or early in the am."

18. MANDELL told Victim 1 that he had added an exhibit— "Exhibit A"—to the operating agreement which he told Victim 1 "spells everything out clearly." Exhibit A explained that Victim 1 "agrees to invest equity in [TD Global] that will be used for acquisition, design, engineering, construction, change order, project management, and general conditions." Exhibit A noted that Victim 1 was in the process on obtaining a loan on his Sacramento property, that he was making an initial bridge loan of $18,000, and that this would be paid back when the full loan on the property was obtained.

19. Exhibit A represented that TD Global currently had four projects under development: a) 5 Elliott Drive, Pleasant Hill, CA; b) 1764 Newell Ave, Walnut Creek, CA; c) 1986 Marion Court, Lafayette, CA; and d) 2081 Celeste Ave, Walnut Creek, CA. Exhibit A noted three projects on which TD Global had made offers, and which Victim 1 "will be involved in:" a) 2437 Tice Valley Blvd, Walnut Creek, CA; b) 2847 San Juan Blvd, Belmont, CA; c) 1693 Highland Blvd, Hayward Hill, CA. Exhibit A specified that Victim 1 had the right to "pull all equity out of the projects but only at the time a project is completed, sold, and escrow closes." Victim 1 was given a 50% stake in the company, which would reduce to 12% once "the bridge loan is paid in full and [Victim 1] has been given deed of trust for new projects."

20. In or about June 2014, Victim 1 took out a loan from Northern California Mortgage Fund VII, LLC, d/b/a NCM Lending ("Northern California Mortgage") of approximately $140,000, in order to invest in TD Global.

INDICTMENT                                            4

21. On July 18, 2014, Victim 1's JPMorgan account -8039 received a wire of approximately $140,000 which represented the proceeds of the loan Victim 1 took out from Northern California Mortgage using his Sacramento property as security.

22. Between August and November 2014, Victim 1 made at least six wires to MANDELL as investments in the supposed real estate development projects. In total, Victim 1 made approximately $130,000 in wire transfers from his bank account to MANDELL's Charles Schwab account ending in -2408, which represented most of the proceeds from the loan on Victim 1's Sacramento property.

23. Despite Victim 1's investment, MANDELL did not make significant progress on any of the development projects. In or about October 2014, MANDELL told Victim 1 that he had sold the Hayward property instead of developing it. MANDELL told Victim 1 that he had made $88,000 from the sale, and that he had a better deal on a San Francisco property that Victim 1 could roll his investment funds into.

24. Over the next several months, MANDELL continued to ask for money from Victim 1, while also changing his story about how the funds were being used. For example, at some point MANDELL told Victim 1 that rather than a San Francisco property, his investment would be used for a project in Moraga, California known as Hetfield (the Hetfield Project). On November 12, 2014, MANDELL sent Victim 1 another email describing another project in Saratoga, California, and urgently requesting $11,000 for deposits. MANDELL told Victim 1 he would receive 12% interest on the $11,000 in addition to another $18,000-$35,000 in returns once the property sold.

25. Wire transfer records reflected that Victim 1 sent Mandell a wire of approximately $11,000 on or about November 14, 2014.

26. On May 1, 2015, MANDELL told Victim 1 about another investment project, this one referred to as the Kingsdale Project. MANDELL also promised Victim 1 returns from a project on Holcomb Court in Walnut Creek.

27. Between July 2014 and August 2015, MANDELL was not making payments on the loan on Victim 1's Sacramento property as promised, and as a result by April 2015 the loan was in default.

28. On August 10, 2015, MANDELL sent Victim 1 an email attaching a letter that purported to revise their operating agreement. The letter acknowledged that MANDELL had not paid off the loan,

INDICTMENT                                          5

as he had promised, and that this was causing Victim 1 to be "stressed." The cover email acknowledged that the loan servicing company considered the loan to be in default. MANDELL proposed that Victim 1 refinance the loan, with the new loan being paid off by proceeds from the Hetfield Project. MANDELL said he expected that the new loan would be paid off by October 31, 2015. MANDELL also promised Victim 1 that he would make significant profits when the Hetfield and Holcomb Court projects closed.

29. Victim 1 refinanced the loan as MANDELL requested, but MANDELL continued to fail to make the payments. The new loan was placed in default and Victim 1's Sacramento property was foreclosed and sold at auction.

30. MANDELL made no significant progress towards completing the Hetfield Project, or any other project that MANDELL represented to Victim 1 he would use his investment funds to complete. Instead, Mandell used Victim 1's investment funds for numerous personal expenses, including approximately $20,000 on travel expenses (car rental, hotel stays, and tickets to sporting events); approximately $5,000 at Target and Walgreens; $1,500 at Nordstrom, Ross, Tiffany, and Best Buy; approximately $1,500 for fuel and car repairs; approximately $900 at pet stores, approximately $500 for a luxury dinner; and approximately $300 for fees at a golf club.

### *MANDELL induced Victim 2 to invest in real estate development projects and stole Victim 2's investment*

31. Between 2017 and 2020, Mandell continued his scheme to defraud by inducing Victim 2 into investments that purportedly would be used to develop residential real estate on a property in San Francisco and the Hetfield Project.

### *The Hills SF Project*

32. Victim 2 met MANDELL in or around 2014. In or around 2017, she listed for sale a vacant parcel of land she owned in San Francisco. The property was appraised at a value of $9,000,000. MANDELL proposed that Victim 2 and MANDELL enter a joint venture to develop the land by building and then selling up to 80 housing units on the property. MANDELL explained to Victim 2 that the property would be transferred to a limited liability company to protect it, and that he would get an easement to develop the land. MANDELL also said he would get an engineer to complete a soil report.

In order to begin the development, MANDELL told Victim 2 he would need to take a loan out against the property. MANDELL would receive 50% of the sale proceeds, Victim 2 would receive the other 50%.

33. On or about August 14, 2017, MANDELL created The Hills SF, LLC, which is the entity he told Victim 2 would be used to develop the property. MANDELL and Victim 2 were both 50% owners of The Hills SF.

34. On or about September 11, 2017, Victim 2 transferred her San Francisco property to The Hills SF. Victim 2 agreed to allow MANDELL to take out a loan against the San Francisco property, but the loan was not to exceed the amount needed to develop the property.

35. On December 14, 2017, MANDELL, acting on behalf of The Hills SF, entered a Deed of Trust in which the San Francisco property secured an approximately $250,000 loan from BayMark Financial Inc. On December 19, 2017, the proceeds from the loan, amounting to approximately $200,000, was wired to Bank of America Account -7602, an account in the name of The Hills SF, Inc.

36. Despite Victim 2's instruction that the loans not exceed the amount necessary to execute MANDELL's development plans, he continued to take loans out against the San Francisco property throughout 2018, 2019, and 2020. For example, on or about September 11, 2018, MANDELL took out a $999,000 loan from Superior Loan Servicing. This loan was used to pay off the original $250,000 loan from BayMark Financial, and, after fees and commissions, the balance of approximately $400,000 was wired to The Hills SF Bank of America Account ending in -7602. Throughout 2019, MANDELL took out another approximately $525,000 in loans against Victim 2's property. On or about August 3, 2020, MANDELL again refinanced the debt on the property, taking out a $1,600,000 loan from Alliance Portfolio. This time, after payoffs and commissions, only approximately $10,000 remained, which was wired to The Hills SF Bank of America account ending in -7602. In total, MANDELL took out eight loans for a total of nearly $4,000,000:

INDICTMENT 7

| Loans MANDELL obtained against Victim 2's San Francisco Property |||
|---|---|---|
| **Date** | **Loan Amount[1]** | **Lender** |
| 12/18/2017 | $250,000 | BayMark Financial |
| 7/6/2018 | $121,500 | Channel Choice - Private Party |
| 10/3/2018 | $999,000 | Superior Loan Servicing - Private Party |
| 3/20/2019 | $300,000 | Private Party |
| 3/20/2019 | $100,000 | Private Party |
| 9/30/2019 | $225,000 | Private Party |
| 8/19/2020 | $1,600,000 | Alliance Portfolio |
| 1/11/2021 | $200,000 | Roland Stone - Private Party |
| **Total Loans** | **$3,795,500** | |

37. Victim 2 was not aware of any of these loans. When Victim 2 requested to review The Hills SF's books and records, MANDELL refused. MANDELL used some of the loan funds listed in the above table to pay off earlier loans.

38. In or around July 2022, there were approximately $2,000,000 in unpaid loans on the San Francisco property, which MANDELL had allowed to fall into default. In or about July 2022, the San Francisco property was sold at auction for approximately $1,700,000. Other than obtaining an appraisal of the property, Mandell took no significant actions to develop the San Francisco property. Victim 2 lost the entire value of the property.

39. MANDELL misappropriated for personal use no less than $100,000 of funds derived from Victim 2's property. For example, MANDELL made numerous personal payments from Victim 2's investment funds, including approximately $15,000 in travel expenses (including an November 1, 2018 payment to Ritz Carlton), approximately $3,500 to Carpet Works, approximately $10,000 to Kaiser for personal health insurance, and approximately $1,000 in utility payments. MANDELL also used Victim 2's investment to fund approximately $80,000 in transfers, unknown to Victim #2, to a bank account for the East Bay Land Company LLC, another real estate development company MANDELL controlled and which appears unrelated to The Hills LLC. Finally, MANDELL used portions of the funds belonging to The Hills LLC to make payments to other individuals, included a

---

[1] All loan amounts are approximate.

INDICTMENT                                                        8

$7,202 check to Victim 1 listed as for "interest."

*The Hetfield Project*

40. In or around February 2020, MANDELL also induced Victim 2 to loan $190,000 to the Hetfield Project. MANDELL entered into a promissory note in which he promised to use $190,000 money to "pay contractual obligations to the Town of Moraga, Engio, LSA, John Wyrio, Lea & Braze Engineering." MANDELL promised to pay the money back on or about March 2, 2020, plus 12% interest, and to provide a bonus payment of $70,000 as the Hetfield Project properties sold.

41. On February 5, 2020, Victim 2 wired approximately $190,000 from her Wells Fargo account -8544 to Mandell's Bank of America account -9660.

42. Approximately $130,000 of the funds were used for payments that may have been related to the Hetfield Project. However, MANDELL misappropriated a significant portion of the funds for unauthorized expenditures, including approximately $11,000 for a lease payment on his personal residence, approximately $5,000 at Home Depot, an approximately $3,500 payment to Victim 1, approximately $1,900 for hotels stays and golf club fees, and approximately $1,500 in payments to a Montessori pre-school.

43. MANDELL never paid the loan back and as a result Victim 2 lost her entire investment.

***MANDELL induced Victim 3 to invest real estate development projects and stole Victim 3's investment***

44. In or about 2021, MANDELL continued his scheme to defraud, fraudulently inducing Victim 3 to invest in the Hetfield Project, as well as a real estate development project in San Jose known as Brasillia Hills.

*The Hetfield Project*

45. Victim 3 was introduced to MANDELL in 2021 by Real Estate Broker 1. Real Estate Broker 1 told Victim 3 that she had partnered with MANDELL on two different real estate development projects: the Hetfield Project in Moraga and Brasilia Hills in San Jose. MANDELL asked Victim 3 to invest in the Hetfield Project and Brasilia Hills Project

46. In or about April and May 2021, MANDELL shared architectural drawings for the Hetfield Project with Victim 3, explaining that it was intended to be a sub-division of seven single

INDICTMENT 9

family homes. MANDELL claimed that he had become involved with the Hetfield Project in early 2021 when he assumed the note on the property from previous owners, which amounted to nearly $3 million. MANDELL asked Victim 3 to invest $3,000,000, which would be used to pay off the existing debts. MANDELL told Victim 3 that he would be paid back his $3,000,000 and would receive 50% of the remaining profits from the sales of the homes.

47. MANDELL did not disclose to Victim 3 that Victim 2 had loaned $190,000 to the Hetfield Project in exchange for 12% interest and a $70,000 bonus payment when the homes sold.

48. On or about May 17, 2021, MANDELL and Victim 3 formed a new entity, Hetfield Estates Partners LLC, and entered into an operating agreement that made both MANDELL and Victim 3 managers. The agreement stated that the purpose of the entity was "development and construction of seven (7) single-family homes in a project better known as Hetfield estates located in Moraga, California." The agreement entitled both managers with the right to approve all "management decisions" and required both managers to "devote their best efforts and energy working to achieve the business objectives and financial goals of this LLC."

49. Based on the representations MANDELL made, Victim 3 agreed to invest in the Hetfield Project. On various dates in May, June, and July 2021, Victim 3 wired $3 million from a Bank of America account controlled by his investment entity to Hetfield Partners LLC account:

| DATE | AMOUNT | ACCOUNTS |
|---|---|---|
| 5/19/2021 | $1,000,000 | Victim 3's BoA account to Hetfield Partners BoA account -9660. |
| 5/26/2021 | $500,000 | Victim 3's BoA BoA account to Hetfield Partners BoA account -9660. |
| 6/1/2021 | $500,000 | Victim 3's BoA BoA account to Hetfield Partners BoA account -9660. |
| 6/22/2021 | $500,000 | Victim 3's BoA BoA account to Hetfield Partners BoA account -9660. |
| 7/28/2021 | $500,000 | Victim 3's BoA BoA account to Hetfield Partners BoA account -9660. |

INDICTMENT                                          10

50. Mandell did not use Victim 3's $3,000,000 investment to pay off the Hetfield Project property loans as he promised Victim 3.

51. In October 2021, the Hetfield property loans went into default. MANDELL did not tell Victim 3 that the loans were in default. Victim 3 learned the loans were in default at the end of 2021 and confronted MANDELL, who told Victim 3 that he should not involve himself in the project.

52. On or about April 5, 2022, MANDELL attempted to refinance the Hetfield Project loans in order to avoid foreclosure on the property. MANDELL approached a lender about refinancing the loan. MANDELL requested a $13.5 million loan. MANDELL represented that he would use $3,000,000 to pay off the original loan and the remainder would be used for development costs. The loan included a $1,000,000 reserve that could be used for monthly payments. The lender required that Victim 3 be the obligator and guarantor of the loan. Victim 3 was initially against the new loan. MANDELL convinced Victim 3 to enter the loan by signing a new operating agreement for the Hetfield Project in which MANDELL absorbed all the property debt and increased Victim 3's share of the profit. MANDELL also attached a new addendum with a timeline and milestones for the project.

53. MANDELL made some payments on the new loan with the reserve amount. However, MANDELL never made any significant progress towards completing the Hetfield Project. Victim 3 eventually found that the loan payments were not being made, and the loans were in default. On or about February 3, 2023, Victim 3 filed a civil lawsuit to remove MANDELL from the Hetfield Project, to proceed with the development himself in an attempt to recover some of his investment.

54. MANDELL misappropriated significant portions of Victim 3's $3,000,000 investment in the Hetfield Project properties.

55. MANDELL diverted a significant portion of Victim 3's investment funds to a separate project in Hawaii, concealing the diversion from Victim 3. MANDELL had asked Victim 3 to invest in the Hawaii project, but Victim 3 declined to do so because of the lack of progress on the Hetfield Project and Brasilia Hills. Nevertheless, from July to December 2021, MANDELL made three wires totaling approximately $500,000 of Victim 3's investment funds as a deposit on a property at Amaui Dr., Lot 5-A, Kamuela, Hawaii, that MANDELL purportedly wanted to develop. The funds were wired from Hetfield Partners BoA 9660 to First Hawaiian Bank account controlled by Title Guaranty for Hapuna

INDICTMENT                                         11

Partners in Kamuela, Hawaii. The deposit was non-refundable. MANDELL attempted to find additional investors to partner with him on the project in Hawaii, but was unable to do so. The transaction never closed, and the entirety of the deposit was forfeited.

56. Mandell also used Victim 3's investment funds to pay for various personal expenses, including approximately $140,000 to United Yacht Sales and Dublin Chevrolet, approximately $50,000 in lease payments on his personal residence, and $45,000 in travel expenses.

*The Brasilia Hills Project*

57. In or around August 2021, shortly after Victim 3 invested in the Hetfield Project, MANDELL also induced Victim 3 to invest in the Brasillia Hills Project.

58. MANDELL showed Victim 3 community maps and took Victim 3 to see the location. MANDELL told Victim 3 that the property was for sale for $6.2 million. MANDELL asked Victim 3 to invest approximately $3.9 million towards the purchase of the property. The remainder of the purchase price would be paid out of a $13.5 million loan from Construction Loan Services LLC, a portion of which would also be drawn down for development expenses. Victim 3 agreed to provide the investment. MANDELL and Victim 3 both signed an operating agreement creating Brasilia Hills Partners LLC, with terms similar to the Hetfield Partners operating agreement.

59. MANDELL was unable to purchase the property directly because the owners of the Brasilia property would not sell to him. MANDELL managed to complete the sale only by having the property sold to Associate 1, who then transferred the property to MANDELL in the name of the Brasilia Hills Partners LLC. MANDELL paid Associate 1 $150,000.

60. At the close of escrow in October 2021, approximately $500,000 of excess funds in escrow were wired into Brasilia's BoA account ending in -2857.

61. MANDELL hired architects, contractors, and applied for permits, but then failed to pay them. MANDELL also never made any of the payments on the loan, which went into default. The loan accrued $500,000 in late payment penalties for failure to pay over six months. MANDELL also allowed the approved map to build the townhouse community and the permits from San Jose expire, which prevented the project from going forward.

62. MANDELL misappropriated a significant portion of the Brasilia Hills investment funds

INDICTMENT                                    12

for personal use. MANDELL transferred approximately $75,000 into his personal Bank of America account -7577, which he then transferred to his personal Coinbase cryptocurrency exchange account. MANDELL also spent funds on other personal expenses, including approximately $40,000 for boating expenses, $20,000 for personal debt payments, and $19,000 for a lease payment on his personal residence.

63. In order to complete the project and preserve part of his investment, on or about February 3, 2023, Victim 3 took legal action to remove MANDELL from management and move forward on the project without him.

COUNTS ONE THROUGH SIX:   (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

64. Paragraphs 1 through 63 of this Indictment are re-alleged and incorporated.

65. Beginning at a date unknown to the grand jury, but no later than November 29, 2017, and continuing through a date unknown to the grand jury, but to at least October 26, 2023,

ERIC MANDELL,

did knowingly and with the intent to defraud devise and execute, and attempt to execute, a material scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by omissions and concealment of material facts.

66. On or about the dates set forth below, in the Northern District of California and elsewhere, for the purpose of executing the scheme and artifice referred to above, and attempting to do so, the defendants did knowingly transmit and cause to be transmitted writings, signs, signals, pictures, and sounds in interstate commerce by means of wire communications:

| COUNT | DATE | ITEM WIRED |
|---|---|---|
| 1 | 10/4/2018 | Fedwire transfer of $404,960 from City National Bank account ending in -9091 to Bank of America account ending in - 7602. |
| 2 | 8/19/2020 | Fedwire transfer of $10,880 from Bank of the West Account -2911 to Bank of America account ending in -7602 |
| 3 | 5/19/2021 | EFT transfer of $1,000,000 from Bay Realty Investments account ending in -5902 to Hetfield Partners Bank of America account -9660. |
| 4 | 12/30/2021 | Fedwire transfer of $350,000 from Bank of America account ending in -9660 to First Hawaiian Bank account ending in -1015. |
| 5 | 10/4/2021 | Clearing House Interbank Payments System wire transfer of $503,646 from Wells Fargo account ending in -8979 to Bank of America account ending in -2857. |

INDICTMENT                              13

| Count | Date | Item Wired |
|---|---|---|
| 6 | 2/25/2022 | Fedwire transfer of $29,848.78 from Bank of America account ending in -2857 to Envoy Marine Diesel |

Each in violation of Title 18, United States Code, Sections 1343 & 2.

COUNT SEVEN:   (18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

67.   Paragraphs 1 through 63 of this Indictment are re-alleged and incorporated.

68.   On or about January 20, 2022, in the Northern District of California and elsewhere, the defendant

ERIC MANDELL,

did knowingly engage in a monetary transaction by and through a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, specifically, a transfer of $25,000 from a Bank of America account ending in -7577, such funds having been derived from the specified unlawful activity of wire fraud, in violation of Title 18, United States Code, Section 1957.

FORFEITURE ALLEGATION:   (18 U.S.C. §§ 981(a)(1)(C), 982(a), & 28 U.S.C. § 2461(c) – Criminal Forfeiture)

69.   All of the allegations contained in this Indictment are re-alleged and fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a), and Title 28, United States Code, Section 2461(c).

70.   Upon a conviction for the offenses alleged in Counts One through Four of this Indictment, the defendant,

ERIC MANDELL,

shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2), and 28 U.S.C. § 2461(c) all property, real or personal, constituting, and derived from, proceeds the defendants obtained directly and indirectly as the result of those violations, including but not limited to the following:

(a)   a forfeiture money judgment in an amount equal to the total proceeds from the commission of said offenses and

INDICTMENT                                         14

71. If any of the aforementioned property, as a result of any act or omission of the defendants –

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

any and all interest the defendants have in other property shall be vested in the United States and forfeited to the United States pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

All in violation of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a); Title 28, United States Code, Section 2461(c); and Rule 32.2 of the Federal Rules of Criminal Procedure.

DATED:                                              A TRUE BILL

_____
FOREPERSON

CRAIG H. MISSAKIAN
United States Attorney

   /s/ Evan M. Mateer
EVAN M. MATEER
Assistant United States Attorney

INDICTMENT                                              15